This honorable appellate court for the 2nd District is now open. The Honorable Justice Catherine E. Zinoff presiding along with Justice Mary S. Shostak and Justice Donald C. Hudson. The case is number 219-0840, Judith Mayster, plaintiff appellant versus J. Steve Santacruz et al., defendant's appellees. Arguing for the appellant, Diana C. Taylor. Arguing for the appellees, Valerie Langerich. Thank you. At this time, Ms. Taylor, you may begin your argument. Thank you. May it please the court, my name is Diana Taylor and I am here today representing Scaramouche Enterprises, the appellant in this case. Scaramouche respectfully asks this court to reverse the trial court's decision in favor of Schoolhouse for MAP as to its failure to mitigate damages affirmative defense for two reasons. First, the trial court erred in entering judgment in favor of the proponent on the affirmative defense of failure to mitigate damages when evidence of avoidable damages was not presented by Schoolhouse. And second, it erred in the same regard in finding that Scaramouche did not make reasonable attempts to mitigate its damages when it relisted the center as it had done prior to this transaction and contacted interested sellers. Your Honors, this case is about the evidentiary threshold that a proponent of a failure to mitigate damages defense bears. In this case, the trial court found that Schoolhouse had breached the asset purchase agreement with Scaramouche. Schoolhouse was liable to Scaramouche despite the trial court awarded Scaramouche no damages because of Ms. Meister's, quote, absolute and complete failure to mitigate. Because these issues do not require the court to weigh disputed material facts and because the trial court relied on an erroneous conclusion of law, Your Honors should apply the de novo standard of review. To my first point, the trial court erred in entering judgment in favor of the proponent on the affirmative defense of failure to mitigate damages when evidence of avoidable damages was not presented by Schoolhouse. Because this affirmative defense is not a complete bar to damages in the event of an unreasonable plaintiff. Rather, the proponent must establish the extent of avoidable losses. Here, there is no evidence as to the extent of avoidable losses, a burden to be borne by the defense's proponent. The case law is very clear that upon proof of an unreasonable plaintiff, the defense is not a complete bar to damages. This is consistent with the construct of causation. Unless the non-mitigators action caused the damages to balloon, there is no reason to penalize her conduct with a bar of recovery. In error, our trial court found that Scaramouche did not give anyone the opportunity to purchase the center and for her absolute failure to mitigate damages, the court awarded her nothing. And simply, this does not comport with the law. It must be demonstrated that what the plaintiff failed to do had some impact on ballooning damages. That being said, in the event of an unreasonable plaintiff, when the proponent can demonstrate the extent of avoidable losses, the plaintiff's recovery will be offset by that amount. I would direct this court to Dillman & Associates v. Capital Leasing Company. In that case, there was a copier that was either defectively manufactured or otherwise inadequate. This is a counterclaim context, so the burdens are a bit switched. But in that case, the defendant refused to reclaim the copier from the plaintiff's premises. The court stated there is indeed evidence that the defendant refused to reclaim the machine after plaintiff stopped making payments under the lease and that the machine remained on plaintiff's premises at the time of trial. This is not, however, sufficient evidence to support a claim on non-mitigation since it provides no basis for determination of the amount of the set-off to which proponent is entitled as a result of the alleged non-mitigation. The court clearly stated that the proponent bears the burden of proof as to the extent of non-mitigation. Here, the same deficient evidence exists. The trial court states as much in saying, now, there wasn't any testimony as to what price this could have sold or should have sold or might have sold. All I know is that after this was terminated, Ms. Macer increased the price back up to the $130,000 she originally requested. In addition to being consistent with the case law, this court's reversal of the trial court's in favor of the defendant would also be consistent with the policy justifications underpinning the failure to mitigate damages defense. This is a concept that arises in many contexts, landlord-tenant, personal injury, employment. So we're looking for a universal rule that applies fairly in each application. Justification for the failure to mitigate affirmative defense is it negates any tendency to become injured and sit by idly and allow damages to balloon. But if the damages are not increasing, if they are not ballooning, and if they are not avoidable, this policy justification does not support recovery. While the failure to mitigate damages defense is a vastly applicable concept, what we confront here is a more unique situation where the value of this contract is largely in the eyes of the beholder. There is simply no evidence that anyone besides Santa Cruz valued the Barrington Center, especially to the tune of $100,000. The uncontradicted evidence, as admitted by the trial court, was the Barrington Center was a losing proposition, and Santa Cruz himself admitted that in June 2017, he felt that $100,000 was overpaying for the Barrington Center. He also admitted that in talking to his magnesium colleagues, they thought the price that was being asked was extraordinary, and it was going to require either someone like me who saw value in the territory, or she was going to be stuck. I would conclude this point in highlighting that another policy of the damages construct is that a guilty party should be liable for the full foreseeable consequences of its wrongdoing. The failure to mitigate damages is an exception to that, and so I would ask in this case, what did Ms. Maester do that was so wrong that warrants having to close her business for no value when she had otherwise entered into an agreement of sale for $100,000? For my second point, the trial court erred in finding that Scaramouche did not make reasonable attempts to mitigate its damages when it relisted the center as it had done prior to this transaction and contacted interested sellers. The mitigator is required to take reasonable efforts to mitigate damages. In this case, there's two basises by the trial court for how she did not mitigate. The first was that she did not list the center on magnesium matters, but this analysis should not serve as a hypercritical examination of her efforts. Simply, the center was listed for sale, and she was attempting to sell it. The second area where the trial court found that she did not mitigate was with her listing price. In Ms. Maester's experience, the listing price did not have a strong correlation to any offer that may come in for the property. She had previously sold her Gray's Lake Center. The listing price at the time of sale was $90,000, and the transaction closed for $15,500. With her $130,000 listing price on the Barrington Center, she had received offers of $120,000, $110,000, and $100,000. The trial court found that Ms. Maester did not give anyone the opportunity to purchase the Barrington Center for $100,000 or some other price. To the contrary, she posted the center as for sale. She simply was not able to sell it. To require her to do anything other than rely on expert advice in her experience is engaging in a hypercritical examination of her conduct. She has to take reasonable efforts to mitigate her damages. She is not required to make all reasonable efforts. For these reasons, Scaramouche Enterprises respectfully asked this court to reverse the trial court's decision in favor of the defendant as to the failure to mitigate damages affirmative defense because the trial court erred in entering judgment when evidence of avoidable damages was not presented, and it erred in the same regard in finding that Scaramouche did not make reasonable attempts to mitigate its damages. Thank you. Thank you very much, counsel. This is Justice Ziaf. I'm going to take the lead on questioning first this morning. Counsel, didn't Maester tell the franchisor that she decided to close the business in January, February 2018 for personal reasons rather than list it and try to sell it? Your Honor, I believe that's a little bit of an intermixed factual basis. So it was her decision to close the center. It wasn't forcibly closed by anyone. I think the testimony was that multiple factors went into that, the first one being that the business was not a sustainable business. She was losing money as part of the center. She also had, I guess, more personal reasons for wanting to close. Her desires to still retire were present, but I don't think it was solely a personally motivated decision. And in the period of time from August 2017, shortly after this transaction did not close until January of 2018, the center was listed for sale. Well, if—so obviously the business no longer exists. So if this court were to order a defendant to pay your client over $100,000, the defendant ends up with nothing, correct? I'm sorry, which—yes, that's correct. There's no business to be obtained anymore. Okay. And why should the defendant pay for Maester's voluntary decision to close the business? I know you articulated various reasons, but it was a voluntary decision. There was testimony that it was just too much. There were personal reasons she had told her staff. So why should the defendant pay for that decision? Because the defendant made a decision to enter into the asset purchase agreement with Ms. Well, if—couldn't the plaintiff have avoided all damages, including the cost of these leases, if Maester accepted Maester's offer to reinstate this purchase agreement? There was never an offer that didn't change the terms of the original agreement. It was a renegotiation of the original agreement. For example, the asset purchase agreement did not include any obligation to provide a lien search. Ms. Maester did agree that a lien search could be done. It would have to be at Mr. Santa Cruz's and schoolhouse's expense. But there was never a reinstatement that didn't modify the original asset purchase agreement. Well, let me ask this. How was it not a breach of the duty to mitigate damages when Maester raised the purchase price by 30 percent? So the negotiation originally was $100,000, and then when everything fell apart, then she first—then she next asked $130,000. I would note that it's not the purchase price that she has raised. She's raised the listing price, and from what Mr. Santa Cruz's purchase price was, the listing price has always been the same. When Mr. Santa Cruz entered into the asset purchase agreement, the listing price was $130,000. Now, obviously, what he was going to pay was only the $100,000, but the listing prices remained consistent. And because there were no offers on the property after August of 2017, when she had relisted the center, there's no opportunity for her to accept a lesser purchase price. The listing price was out there as a figure, but there's no offers coming in. Isn't it a basic principle noted authorities such as E. Allen Farnsworth have expressed the principle as an injured party is precluded from recovering damages for losses it could have avoided? Would you agree that's the basic principle, the principle of avoidable losses? Absolutely. Avoidable losses is the principle. All right. And here, weren't there ways that Maester could have avoided the losses, such as actually not even imposing some of these additional conditions when the defendant offered to reinstate the APA? I think the idea there is it's a renegotiation of the original agreement. It doesn't cure the breach of contract. It's a renegotiation, and I think the case law does support that she is not required to accept a renegotiation of terms. Well, while she's not required to accept a renegotiation of terms, she is required to take steps to mitigate damages, correct? That's correct. All right. At this time, I don't have any further questions. Justice Shostak, do you have questions? I do. Ms. Taylor, you had indicated that you felt, in your brief and today, you indicated that you feel the standard of review is de novo. Aren't damages a question of fact, which would make this standard of view be against the manifest weight of the evidence? Damages are generally against the manifest weight of the evidence. A de novo review is particularly appropriate here, where the trial court has erred in its a complete bar to recovery. The failure to mitigate damages is a complete bar to damages. Well, this is a doctrine of avoidable consequence, right? Correct. That's what we're looking at. Okay, so there is no recovery for damages that might have been avoided by a reasonable effort on the injured party. It seems to me there was no effort on her part in order to mitigate these damages. What was her effort? She relisted the center as for sale. She made attempts to resell the center by relisting it and then also contacting individuals that had expressed interest in the past. But he expressed interest and he wanted to proceed with it, didn't he? So her failure to take up his offer and reject his offer, where she might have had to pay a little bit more for some search of a record, is a little bit less versus nothing at all. Is that mitigation? First, I don't think that's the basis of the trial court's finding. I think that the basis was she did not relist the center in the locations that the trial court thought was appropriate and she did not relist it at the appropriate listing price. Second, to reiterate my previous answers, the reinstatement was a renegotiation of the contract. Well, it wasn't the renegotiation of the original contract. There were some changes, which is my point. So instead of getting $130,000, she would have got $100,000. Doesn't that come into play in mitigation? I don't think that's correct, Your Honor. The contract was always for $100,000. But she subsequently listed it at $130,000, correct? Correct. So one of the reasons that she indicated that she didn't list it on that NASM Matters website is because she didn't want to tip off her employees. However, she brought the defendant with her and told the employee that she was probably going to be selling to this individual, didn't she? I think there was a disputed fact. Oh, that was a disputed fact? Okay. I think that was a disputed fact, if I may finish my answer on that. That was also one employee. It was not an announcement while he was present at the center. Only one employee knew why he was present there. Well, and you had argued that the judge is incorrect in whether the court reduced the damages by reducing the damage to zero. Is there a difference between reducing the damages to zero versus barring the damages as to what the court did here? Mathematically, no. I mean, the end result, if he finds that there is a complete bar of damages, then the results would still be zero. But there is no analysis as to what the extent of avoidable losses was. And I think it's very clear in the language of not having evidence of what the center could have sold for. Mr. Santa Cruz's testimony was that the Barrington Center was overpriced, but he was essentially willing to pay for it because he really liked the territory. There's no evidence that other people would find value in that. Your opponent cites the Donata Square case. How do you distinguish that case? We're talking about a ready, willing, and able purchaser. Again, I think we have, there's a lot of back and forth regarding the reinstatement of the assets. Purchase agreement. There wasn't ever a period of time where there was a willing purchaser on the same terms that we had had before. And I think the near Temid congregation of Northtown makes clear that the renegotiation of a original agreement is not required. But if they would have, if when Meister was offered the alternate, the alternative offer, wouldn't that substitute arrangement have mitigated 100% of her damages? I don't believe that's true, and I don't know that terms were ever going to be reached between these parties. There was back and forth in offers, but there was always, it was always the original asset purchase agreement being renegotiated. Okay, well, there is no, Justice Enos asked you if there was a duty to mitigate. There's really no duty to mitigate. But if you don't mitigate, you shouldn't be asking for damages, correct? There's not a duty to mitigate. You're expected to mitigate. Correct. And she didn't do that here, did she? She did do that here in relisting the center, making it available for other purchasers to make an offer. Simply no offers were received. Okay, thank you very much. I have no further questions, Justice Enos. Justice Hudson? Yes, thank you. Ms. Taylor, you do seem to recognize, of course, that the general rule is that a person who was injured by a breach of contract must make a reasonable effort to avoid damages, correct? Correct. All right, but you also raise a point that even if that's the case, you seem to be saying she should have been able to recover something, is that correct? Correct. But here's what I'm struggling with. First of all, how does the trial court know what is, for lack of a better term, the set off is supposed to be by the failure to mitigate damages? What specific evidence did you present or tend to the trial court that said, okay, maybe we didn't mitigate to the extent we should have, but we're entitled to recover something? What was that something you presented to the trial court? It's not our duty or burden of proof to present evidence of the amount of set off. I think the case law is clear from the cases I cited, even during my argument, that the proponent of the defense needs to present evidence as to what would have been avoidable to assist the trial court in making the determination of the amount of set off. Okay, you have a legitimate argument, but I think the laws of the damages proximately caused by the failure to exercise ordinary care to minimize cannot be recovered. So if 100 percent, if the trial court felt that 100 percent of Scaramucci's loss was proximately caused by Meister's failure to mitigate damages, then there wouldn't be any damages recoverable, right? If that is the trial court's finding that all of the losses were avoidable, then yes, that the result would remain the same of no recovery. Is that what the trial court found? I don't think that's the holding of the trial court. I think the trial court found that because she didn't give anyone the opportunity to attempt to buy the center, that she was barred from recovering damages in its entirety. The case law is clear that the defense is not a complete bar to damages, that there must be proof of the extensive avoidable losses. And here that did not exist. The trial court was very clear on that, that it did not have evidence as to what the center could have or should have sold for. So can't we infer that the trial court found, as I suggested, that all of the damages were caused by Meister's failure to mitigate. Therefore, there'd be no recovery. And didn't Meister close the center before there was any offers accepted? To the first part of that question, I'll start with the second part. The closing of the center was also a basis of the affirmative defense that was raised. There's no evidence that keeping the center open would have resulted in additional offers. What we're looking at here is a lot of speculation in either regard, whether we're talking about the opinion of if she had kept the center open, would she have been able to sell it? Common sense would tell us if she closes it, she can't sell it. In the regard to the conclusion or potential conclusion by the trial court that the evidentiary record supports that all of her losses were avoidable, there's no evidence that supports she would have been able to resell the center at $100,000. The speculation and opinion that was offered was that if she had reduced the listing price, she would have been able to sell the center. There was no evidence as to what amount she needed to reduce the listing price to in order to sell the center. All right. Thank you, Ms. Taylor. That's all I have. Thank you. All right. Thank you very much. You have time for rebuttal. At this time, we'll hear from Ms. Langerich. Good morning, Your Honors. Can you hear me okay? Yes. Okay. Thank you. May it please the court. My name is Valerie Langerich on behalf of Schoolhouse for Math, the affilee here. We're asking this court to affirm the trial court's ruling. Primarily, there was a large discussion about mitigation of damages already done. I'm going to start with another reason that we submit is the trial court's ruling, which is that the appellant failed to prove damages. Then we'll go back to addressing the mitigation issues. In addition to that, we submit that there are bases to further affirm the trial court's ruling on a basis supported in the record based on contractual issues, which is that the appellant failed to fulfill conditions precedent, which relieved math or the appellee's obligation to of the alleged breach that the trial court found math apparently breached the contract or waived certain issues. We're going to address the materiality of those issues as well. First, the failure to prove damages. I'd like to point out that in addition to the case law cited in our brief regarding the method of proving damages, the appellee also cited the Illinois pattern jury instructions. We find that those are insightful because they state in the simplest terms what Illinois allows as damages in a breach of sale contract and what the appellant was required to prove to receive those damages. Straight out of the jury instructions is that damages allowed are equal to, quote, the contract price minus the fair market value of the property at the time of the breach, unquote. This method of calculating damages is generally applicable to any purchase sale contract for the sale of any type of property, whether good, personal property, or real property. Appellant in her reply brief seems to argue that this rule does not apply to her because she was not required to prove the fair market value of the Barrington Center at the time of the breach because, quote, the applicable damage analysis is putting appellant in this position she would have been in if the contract had been performed, unquote. But, Your Honor, that's just another side of the same coin. Had the contract been performed, appellant would still have given up the Barrington Center. So to prove her damages is to prove what gain she would have received if the contract had been performed. To prove that gain is still the same calculation. It's the contract price minus the value of the Barrington Center. So appellant was still required to prove the value of the Barrington Center to show what she would have gained if the APA had been closed and thus what damages she was seeking. But now she's faced with the realization and admission that the appellant provided no evidence of the value of the Barrington Center, as stated multiple times by the trial court. She now argues she's entitled to rely solely on the contract price as a measure of damages. But, Your Honor, that type of damages analysis for the contract price is only available in a situation where the item at sale is so unique that there's no market. And it cannot be sold on the open market. But that is not the situation here. The evidence presented to the trial court showed not only that the appellant failed to prove the fair market value, but also that there was an active and available market in which the Barrington Center could have been sold, but appellant voluntarily chose not to utilize that market. In her reply, appellant points to three things as evidence for a supposed lack of a market. The first is that the mathnasium market was, quote, unquote, unique. The second is that the Barrington Center wasn't profitable. And third is that the Barrington Center closed. First, the appellant's claim that it's a unique marketplace is an admission that there is a marketplace. The evidence showed that that marketplace was a robust one. In January 2018, appellant received that email that we all discussed earlier from Courtney Evans, offering to list the Barrington Center on mathnasium matters. And she stated in that email, several franchisees were looking to expand on the national level, and others have friends and family throughout the country who may jump at the chance to purchase an existing center. But appellant responded by refusing to list on mathnasium matters. And on that point for why she chose to not list on mathnasium matters, on page 21 of our brief when reciting the trial court record, there are several issues beyond that one disputed issue of fact showing that the employees did know an appellant had made it public knowledge that she was selling the Barrington Center. There's about five or six items there, and facts presented to trial court showing that. But beyond that, we also have that Santa Cruz testified that he had purchased 10 mathnasium centers, and he was in the process of selling another at the time of trial, and he had already received several offers. So the uniqueness of the mathnasium marketplace was not a bar to the sale. It was appellant's refusal to utilize that marketplace, which prohibited the sale. Second, the fact that the Barrington Center wasn't profitable is not proof that it wasn't sellable. It's evidence that her listing price was too high. Santa Cruz testified that math knew the Barrington Center wasn't profitable because it had so few students, and that mathnasium corporate guidelines indicated that a reduction in sale price was appropriate, not that it couldn't be sold, but that she had to reduce her listing price in accordance with the number of students she had. Mathnasium guidelines, which she had notice of because of her email exchanges with Santa Cruz, showed that she should have had $1,000 per student, which would have been around a $60,000 sale price. Math made the offer to purchase the Barrington Center, even knowing it wasn't profitable, and stated its lack of students could be remedied by a marketing campaign to attract more students. So the lack of profitability of the Barrington Center is an operator issue, not a market issue. Finally, appellant points to the center's closure as evidence that there was no market. But let's examine why the center closed. This was discussed in depth prior to that appellant decided not to list the center on mathnasium matters, and it was for personal reasons. She's committed to the dealership. I am 57 years old and adding hours, and I cannot really keep up. She testified to the trial court, the same thing that she stated in that letter, which is obviously I would rather sell the center than close, but just cannot keep up the pace to wait another year or however long it takes. So the evidence presented to the trial court showed appellant could have continued to operate the Barrington Center because it was on a month to month leave, as stated in her email to Courtney Evans, but she voluntarily closed it for personal reasons. Here too, the Barrington Center's closure is an operator issue, not a market issue. So we submit that the evidence showed to the trial court that the appellant chose not to sell it, not that she could not sell it. So the appropriate damage analysis is the contract price minus the fair market value of the property at the time of the breach, which therefore requires that appellant prove the fair market value. The trial court noted several times she failed to do so, and a failure to prove the fair market value is a failure to prove damages, which entitled math to judgment as a matter of law, which is what the trial court said in its very last sentence as ruling. So we'd also like to show here that issue about the operating expenses and the double  So appellant's request for recovery of the property and copier lease payments would be a double recovery because appellant was utilizing those leases to benefit her fully functioning business when she was making those payments. She had already gained the benefit from those leases. Anything beyond that from appellee is a double recovery. But now appellant's brief characterizes those lease payments as quote unquote special damages, but special damages are only recoverable if they were reasonably foreseeable. Proof of that foreseeability is completely absent from the language of the contract or presented to the trial court. There is no indication anywhere that appellee would have agreed or would have known that he would be liable to forever pay the operating expenses of a fully functioning business if the APA fell through until appellant found another buyer, especially when appellee had made multiple offers to purchase that property. And double recovery is also an issue in a broader sense, as your honors previously pointed out, because appellant is demanding that math now pay the full contract price for nothing. When math made numerous good faith attempts to purchase that center for $100,000 when the center was fully functional math offers to purchase remained open until the day appellant closed the center and voluntarily destroyed any value it had requiring a pound to pay for the center. Now, after appellant refused to sell it to him and destroyed value would be unfair, unjust and allow appellant to recover far more damages than any damages analysis would provide. So, if your honor has no questions on the issue of failure to prove damages, I would move over to mitigation. So, as an initial matter on mitigation, the trial court had no need to reach appellants affirmative defense and calculate the amount of losses that could have been avoided with mitigation because appellant failed to prove the value of the Barrington Center and thus recoverable damages. In fact, an avoidable loss calculation can't be done fairly if appellant failed to prove for damages in the first place. But beyond that, appellant cannot recover damages because the trial court correctly found appellant wholly and completely failed to mitigate any and all of her claim damages. As your honors did note earlier that appellee did make several offers to purchase the Barrington Center which did remain open. And the question that Donata shows us is that whether the appellee made an offer in good faith to pay for the Barrington Center and maybe instilled additional conditions such as an asset lien search or maybe additional requests regarding the continuity of employment in the Barrington Center during the renegotiation process. That question is reasonableness and whether the appellant should have accepted those is a question of reasonableness. We submit it is reasonable and she should have accepted those because they were reasonable offers. But beyond that, her refusal to even negotiate a good offer that was on the table and instead sue appellant or appellee for later dismissed claims of decimation just shows that she refused entirely to even consider a very good, good offer on the table that would have allowed her to completely mitigate. But beyond that, we also have the MBC Inc. case which goes to her relisting the price at $130,000 as the trial court found that relisting price to be quote, unquote, inexplicable. And that finding was correct because MBC holds that a matter of law, appellants relisting the property at 30% above the APA contract price and between 50 and 66 more than the last offer Maester had accepted before she accepted the APA is a matter of law, a breach of her duty to mitigate. And appellant cites no case in which any increase from the contract price, let alone a 30% increase, constituted a mitigation of damages. She also entirely fails to address the critical precedent of MBC in her reply brief. We also have the other mitigation failures that the trial court did note, which is the listing guidelines from the Barrington, from the franchisor, the $1,000 per student. So it would have been around $60,000 if she had followed those things, those guidelines. And she did have notice of those guidelines because she had been in conversations with Santa Cruz about them and emailed prior to Santa Cruz even making his first $100,000 offer. Second, refusing to reduce the listing price at any time before she voluntarily closed it and listing the Barrington Center on only one website. Those were additional efforts that the trial court noted were constituted a failure to mitigate. Now, Your Honors, we do move on to the other bases on which we submit that the trial, this court should affirm the trial court's ruling because the record shows that the APA did require the appellant to produce the balance sheet. And this is a substantial material issue at issue in this case. Both the appellant and her transaction attorney testified that the APA required appellant to produce the balance sheet. The parties do not dispute that this was a requirement. Section 683 required the production of balance sheets and Section 1081 required appellant's representation regarding her production of balance sheets to be true as of closing. And Section 8 specifically allowed the appellant to request, or appellee, sorry, to request and inspect the business books and records of Scaramucci at any time before closing, which includes the balance sheet. Despite the clear language of the APA, appellant argues that the APA was somewhat of some unconditional promise to buy the property because all due diligence review occurred before the APA was signed. The contract terms state otherwise. Any merger clause in the APA still makes every term in the APA operative. So those sections in the APA requiring appellant's representation, yes. Excuse me. I believe your time is up. So if you want, a little bit over. If you want to just quickly summarize, please. And then we'll have time for questions. Sure, Your Honors. We just briefly wanted to address that the waiver. There was no waiver of any of anything. We didn't get to address that. And there are any reply brief. So if you want to ask any questions about the failure of the conditions precedent, the waiver, or the materiality of those contractual issues, if those are relevant to this court, I'd be happy to discuss this further or answer any questions on those. Thank you, Counsel. Again, I'll take the lead on questioning first this morning. I'd like to just on page two of your brief footnote one, you do say that your cross appeal is quote unnecessary. That means that you are withdrawing your cross appeal. Well, Your Honor, we realized that because the ruling was entirely in our favor, we were somewhat prohibited from making a cross appeal because there was no judgment, which we could have been appealing. Rather, we would have only been asking this court to tinker with factual findings, which we understood to not be a basis for an appropriate appeal and use of this court's time. So thus, we just responded to the appeal asking this court to affirm the judgment and offering multiple avenues on which this court could affirm the trial court's judgment. So that's a long way of saying you are withdrawing your cross appeal, correct? Yes. Yes, Your Honor. Okay, thank you. Let me turn to You spend quite a bit of time this morning arguing the plaintiff failed to prove damages. However, at trial, you never did argue that the plaintiff failed to prove damages as part of its case, did you? Well, Your Honor, at trial plaintiff was supposed to prove her damages. Right. And so she didn't at trial and the trial court noted that in the ruling, Your Honor. So then after trial, there was a submission of post trial brief, but those were raised by the appellant for a post trial brief and the only issue raised was the mitigation of damages issue. So that was the only one argued at that time. There was no. Yes, Your Honor. My question to you is, you never argued that the plaintiff failed to prove damages as part of its case at the trial level and the trial court never ruled on that, did it? No, Your Honor. We submit that that's not the case. We submit that the trial court's language is very specific on that issue and the trial court did rule that way because, for example, let me look at the trial court's ruling. It stated, I have no evidence whatsoever as to the actual value of the Barrington Center. And then it states in ruling accordingly, even though I don't find Mr Santa Cruz was justified in terminating. I find that there was no attempt to mitigate damages whatsoever in this case. I cannot find any damages attributable to the breach. I cannot find any damages. And for that reason, I will enter judgment in favor of defendant. Okay, and then. The judge is talking about mitigation.  Well, Your Honor. He had. Yes, sir. I mean, I assume he had to have determined by going to mitigation that there were damages. Well, Your Honor, if he states, I cannot find any damages attributable to the breach. And if he states, I cannot find any damages because he's, as he stated, I have no evidence whatsoever as to the value of the Barrington Center. And then there is discussion that if she had sold it, if she had said, what is it worth? Then we would have some method of calculating her damages. So I understand that the appellate appellant is making the issue solely about mitigation and the appellant made the issue of mitigation solely in her post-trial brief. But appellant couldn't be making an argument that she failed to prove damages at the trial where she was supposed to be proving them because there would have been no opportunity to do so. Because that was in the ruling. And then there was no opportunity to bring this up in the post-trial ruling because the only issue presented by appellant was the issue of mitigation. However, we do feel and we think that the language of the trial court clearly states that there was no issue of value. And if there's no evidence of value, there's no way of proving damages. So she did not meet that burden. And on top of that, how could there be any calculation of avoidable loss if the burden of proving damages is never met in the first place, Your Honor? We see that the language... Yes, Your Honor? Well, let me go back to this issue of damages and also mitigation. After efforts to reinstate the purchase agreement failed, what could Maester have done to mitigate damages? I mean, there were no offers that Maester rejected, correct? No, she rejected the promise offer first. But in addition to that, she could have complied and comported with the precedent held by NBC, which would have been requiring her as a matter of law to list the center at least at the contract price, which would have been $100,000, rather than an inexplicable 30% increase. She also could have taken advantage of the market that the judge and the trial court noted was the most available and robust market that she could have received offers in. But instead, she voluntarily refused to do so. And in addition to that, she could have kept the center open. She could have sold it for anything. She could have done anything to incite offers, but she didn't. A lack of an offer does not indicate an inability to sell it. It just indicates that... Yes, Your Honor? For how long did she have to keep Barrington for sale? Any more than a month, and certainly probably, as the case law indicates, she should have done it at a lower price to incite more offers. And she could have closed it immediately. I mean, she could have sold it immediately to a police. So I think the trial court... Yes, Your Honor? In the absence of any offers, how do we measure the amount of avoidable damages? Well, that's not true, Your Honor, because she had a $100,000 offer. So if you do want to do an avoidable loss calculation, she got a $100,000 offer on the table that she rejected. So you got zero damages there. She could have taken that $100,000 offer. And if she didn't want to pay for the asset lien search, she had the opportunity to sue for those damages just as much as she's making the appellees respond to all of these lawsuits right now. So it's two sides of the same coin. She could have mitigated all of her damages. She could have reduced the listing price. She could have taken advantage of the specific, available, and robust market that would have allowed her to receive offers and sell the property. There was testimony that this market was active, and she refused to even take advantage of it for personal reasons. Right. But there were no opinions offered as to what price Maester would have had to reduce the listing price to sell it. No, there was, Your Honor. Yes, there are. Because we have, for example, at least, not only do we have Santa Cruz, who is part of the Mathanasium Corporate headquarters, who helps develop these guidelines with Mathanasium Corporate. He testified, and the records show that Maester knew that these guidelines were in existence, right? And those guidelines evidenced that she should have at least reduced the listing price to maybe $1,000 per student. That would have been somewhere around $60,000. She refused to even look into that. So we do have some evidence of, like, what she should have been making the listing price. In addition, Your Honor, every prior offer that she had, Math made an offer for $100,000. But prior to that, the record shows that there was, what, another offer that Maester had that was between 57% to 60% less than Math's offer. So she never had an offer that she accepted that was more than $100,000. So there was no reason or basis for her to go all the way up to $130,000, Your Honor. All right. I have just one more question. Didn't Mr. Santa Cruz testify that he concentrated on getting this purchase agreement together rather than doing due diligence? So with that testimony, how can he complain now that he did not receive the balance sheet when he himself let it go, certainly at least until he received notice of the stop order? No, Your Honor, I understand that framing of the fact. But in reality, you have a due diligence letter that asks for due diligence items, right? But then because they had to do it on an expedited schedule to accommodate Ms. Maester's request to do it quickly and within 30 days, he said, okay, we will do this closing within 30 days, but I have to have extra statements and representations in the APA that still get me those balance sheets, other due diligence items, opportunities to review, and the ability to get out of this agreement if I discover discrepancies. So just like any standard purchase agreement contract, closing was not on the day of signing the agreement because several terms of the contract provided for additional opportunity to obtain due diligence materials, review them, and get out of the contract if discrepancies and bad information were produced. We go through each of those provisions at length in our brief, and the due diligence requirement, her representation that I have produced those in Section 6, had to be true as of the day of closing under Section 10. So Maester, yes, Your Honor? Finish your sentence. Which just had to be true by the day of closing. So Maester did have an opportunity to produce those balance sheets prior to the day of closing to fulfill her obligations, and she chose not to. Thank you. All right, those are all my questions. Justice Shostak? I think she's on mute. I'm talking on mute. One question. Yes, Your Honor? The balance sheets were not a condition precedent to the purchase. Yes, Your Honor, they were. Yes, Your Honor, they were. And here's how. In the language of the contract under 6A, it states that you are supposed to provide the balance sheet, and then it attaches an exhibit saying, I've provided the balance sheet in Exhibit D. So then when we go to the conditions precedent, which is Section 10A1, it states, the representations of warranties of seller contained in this agreement must be true and correct as of the closing date. And those are, quote, conditions of the obligation, to quote. So if she makes a representation in Section 6A stating, I've given you the balance sheet, then, as an obligation prior to closing, to get the obligation of the appellee to actually close, pursuant to Section 10A1, that has to be true to trigger appellee's counter obligation to close. So yes, it is a condition precedent, Your Honor. OK, so you're reading that all together to come up with that. Yes, Your Honor, we submit the contracts are supposed to be read together, especially when the language is that specific. Like Section 6A is. Thank you. I have no further questions. Thank you. Thank you. Justice Hudson? I think the panel has covered all the questions I was going to ask. So I have no questions. Thank you, Your Honor. Thank you very much. Thank you for your argument, counsel. At this time, we'll hear from Taylor with reply and rebuttal. I did it as well, talking on mute. Thank you. May it please the Court. First, in rebuttal of appellee's contention that Scaramucci failed to prove damages, this argument must fail because the evidentiary record supports damages of the entire purchase price. While ordinarily, damages from a property-related breach of contract may be the purchase price plus the fair market value of the property that remains in possession of the non-breaching party. Here, the evidentiary record supports that the property had no value. The only person who expressed real significant interest in the property, such to getting to the point of an agreement beyond the due diligence phase, was Mr. Santa Cruz. This is even though the property has been listed for sale for a multiple-year period. In the meantime, the evidentiary record supports that Barrington Mathnasium was operating at a loss and had been. Maester's continued operation of the business without sale was a financially unstable proposition. Therefore, she elected to close her center without any financial realization. The purpose of damages is to put the non-breaching party in the position he or she would have been in had the contract been performed, but not in a better position. The difference between the contract price and what property the non-breaching party retained, in this case, is the entire value of the contract price. And Mr. Santa Cruz knew this as well. This goes back to his opinion that the price that was being asked was extraordinary, and it was going to require either someone like him who saw value in the territory, or she was going to be stuck. For a two-year, at least, period of time, Ms. Maester was not able to find anyone else besides Mr. Santa Cruz who found value in the territory, and that's from the record at 496. As an aside, Schoolhouse did raise an affirmative defense for failure to mitigate damages that related to the closing of the center. It is understood that once Scaramouche closed the center, there is no opportunity for anyone else to acquire the center and no opportunity for Schoolhouse's damages to be offset by a new purchaser. But to reiterate, the burden of proof is on Schoolhouse to prove that the closure of the center resulted in avoidable losses. Beyond initiating the due diligence phase, there is no evidence in the record that anyone besides Santa Cruz wanted this center closed. Second, in rebuttal of the Appleby's contention that the trial court erred in finding Scaramouche had substantially complied with the APA, this argument fails for two reasons. First, there is no obligation under the asset purchase agreement to provide balance sheets, and any previous obligation was merged and extinguished by the APA. The trial court analyzed the language of the letter of intent, which included introductory language that this is in regards to a possible acquisition and states that the parties wish to commence negotiation of a definite written acquisition agreement providing for the consummation of this transaction. There was a due diligence period of 30 days, and that would have continued until July 12, 2017. Under paragraph 13 of the letter of intent, it was clear that there is no binding agreement to purchase until a purchase agreement is executed. In short, upon the execution of the letter of intent, Schoolhouse was free to obtain due diligence information and had no obligation to purchase the Barrington Center. Under the letter of intent, Schoolhouse could have requested the balance sheets. However, on June 29, 2017, Schoolhouse executed the asset purchase agreement knowing that it did not receive the balance sheets. The APA provides for the representation at paragraph 683. The seller has provided purchaser with the balance with the copies of its balance sheets of profit and loss. Both parties knew this to be false at the time this was executed, although Ms. Macer did testify that she thought the language was removed. Most significantly, at paragraph 16E, it states that this is the entire agreement of the parties and supersedes any previous agreement. In other words, the obligations under the letter of intent are extinguished by the execution of the APA. Under the APA, there's no affirmative obligation to produce balance sheets. Trial court reiterated the proper procedure and the language of the agreements, predicates there would be a due diligence period and documents that Schoolhouse wanted to be obtained during that period. It should have made sure to receive those, but once the APA was executed, the due diligence period was terminated by the merger clause of the APA. Second, any obligation to provide balance sheets under the asset purchase agreement was not material to the agreement, such that failure to provide would justify nonpayment by Schoolhouse. On June 28, 2017, Santa Cruz is told that he's not being provided the balance sheets. While there may be ambiguity as to what exactly this meant, if the balance sheets were so did he not make sure that he had them in his hands before he executed the agreement? Why did he execute the agreement? The answer to that is that the items were not material. He had already undertaken an affirmative obligation to purchase the assets, and those assets were being purchased free and clear of any liens and encumbrances per Section 6A.4. For these reasons, Scaramucci Enterprises respectfully asks this Court to deny the appellee's arguments as a basis for affirming the trial court's award. Thank you. Thank you very much. At this time, I do not have any questions. Justice Shostak, do you have questions? I do not. Justice Hudson? I do not. Okay. Thank you, counsel, both of you, for your arguments this morning. The Court will take the matter under advisement and render a decision in due course. At this time, we will conclude our proceedings for the day. Thank you very much. Thank you, Your Honor. Thank you, Your Honors. Bye-bye.